# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00356-CR

**John Anthony Hernandez, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT**
**NO. CR2004-066, HONORABLE JACK H. ROBISON, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

John Anthony Hernandez appeals his conviction for engaging in organized criminal activity. *See* Tex. Pen. Code Ann. § 71.02(a)(1) (West Supp. 2005). Finding that appellant had a prior felony conviction and with an affirmative finding of a deadly weapon, the jury assessed punishment at 55 years' imprisonment and a $10,000 fine. In nine issues, appellant challenges the trial court's (i) admission of evidence relating to gang membership, (ii) refusal to order a witness to testify after invoking his Fifth Amendment privilege, (iii) appointment of a substitute judge for two days of trial, and (iv) erroneous charge. Because the trial court did not commit reversible error, we affirm the judgment of conviction.

**FACTUAL BACKGROUND**

Because appellant does not challenge the sufficiency of the evidence, we will summarize the relevant evidence. The evidence at trial showed that on the night of April 28, 2002, Pablo Esquivel was fatally stabbed by assailants sitting in an automobile. Esquivel and his wife, Amelia, had spent the afternoon cleaning and mowing their property which was located on a dead-end street in an area of New Braunfels that had been abandoned after it had flooded in 1998. Because the area was no longer inhabited, there was no lighting and little traffic. Esquivel and other residents had moved to nearby neighborhoods following the flood. On the evening of April 28, Esquivel and some relatives were preparing barbeque at the property. They observed a car drive by, turn around at the end of the street, and leave; minutes later, it returned again to the dead-end portion of the street, turned around and then stopped in front of Esquivel's property.

Witnesses observed Esquivel approach the car with a flashlight. He appeared to recognize the vehicle's occupants and began to converse with them. In response to an inaudible comment from an occupant in the car, Esquivel responded in Spanish, "Oh, it's you." He turned the flashlight off and, leaning on the car, spoke to the car's occupants. Because the area was dark, the relatives could not see inside the car. Although they could not hear the conversation, they observed that there was no shouting and the conversation did not appear to be heated. After a brief conversation, Esquivel uttered a swear word, fell back, and threw a beer can at the car. He staggered to his car and fell to the ground. The vehicle sped away, spinning its tires. Witnesses observed that Esquivel had been stabbed and was bleeding profusely. As relatives ran to a nearby house to call an

2

ambulance and others tried to render aid, Esquivel died. They gave a description of the vehicle to the police.

Approximately an hour later, after police had been alerted to the description of the car, a New Braunfels police officer stopped a vehicle matching the description for a traffic violation. Appellant, who owned the car, was driving. Santiago Suarez was in the passenger seat, and Daniel Correa was in the back seat. Pursuant to appellant's consent and a search warrant, police recovered a folding knife and a Leatherman tool from the center console area that appeared to have been recently rinsed off, cash in the amount of $5,540 located in a fishing tackle box in the car's trunk, and an envelope from appellant's pocket containing $690.96. The envelope had bloodstains on it. As they placed appellant under arrest, the officers observed bloodstains on appellant's pants.

The scientific evidence at trial showed that there were no latent fingerprints on the knife or Leatherman tool, and that samples obtained from the folding knife and the bloodstains on appellant's pants revealed DNA consistent with that of the deceased. Karen Scalise, a forensic DNA analyst with the Texas Department of Public Safety crime lab in Austin, testified that "there was no doubt in [her] mind" that Esquivel's DNA was on the knife blade. Others testified that appellant and Correa were members of the Mexican Mafia, that Suarez was a prospective member, and that they were looking for a nephew of the deceased who owed appellant a drug debt.

Appellant, Correa, and Suarez were indicted separately. On May 17, 2004, the first day of appellant's trial, Correa pleaded guilty to murder. In his plea agreement, he judicially confessed that, "acting as a party with John Anthony Hernandez and Santiago Suarez Jr.," he did knowingly and intentionally murder Pablo Esquivel. Suarez had not pleaded guilty at the time of

3

appellant's trial. Both Correa and Suarez invoked their Fifth Amendment privileges against testifying. Asserting that Correa had waived his rights against self-incrimination by pleading guilty, appellant asked the trial court to order him to testify. The court declined. Suarez's statements were introduced through the cross-examination of a police officer and the introduction by the defense of videotapes of his statements.

Because a toxicology report showed that the deceased had drugs in his body and Suarez admitted to the actual stabbing, appellant attempted at trial to show that Suarez committed the murder which may have been provoked by Esquivel. He sought to show that Suarez acted alone and that appellant did not anticipate the stabbing and that, in the alternative, the stabbing was done in self-defense.

The jury found appellant guilty of engaging in organized criminal activity by conspiring to intentionally and knowingly cause the death of Pablo Esquivel by stabbing or cutting him with a knife. The jury made a special finding that appellant used or exhibited a deadly weapon during the commission of the offense.

## ANALYSIS

Appellant's first six issues all relate to the admissibility of evidence to which we apply an abuse of discretion standard of review. *See Allridge v. State*, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991). The trial court has wide discretion in determining the admissibility of evidence. *Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990). The trial court's rulings should be sustained on appeal if correct on any theory of law applicable to the case. *Weatherred v. State*, 975 S.W.2d 323, 323 (Tex. Crim. App. 1998). A trial court abuses its discretion when its decision

4

was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1991); *Montgomery*, 810 S.W.2d at 391 (op. on reh'g).

### *Admission of Expert Testimony*

We first address appellant's fourth and fifth issues in which he challenges the admission of the expert testimony of Anita Seamans, a sergeant with the Live Oak Police Department, and Enrique Sanchez, a deputy with the Comal County Sheriff's Office. Specifically, appellant contends that neither witness "demonstrated adequate training or experience to qualify as an expert for the purposes of Rule 702." *See* Tex. R. Evid. 702. Appellant urges that neither expert had specialized knowledge and that their testimony permitted the jury to convict appellant solely on the basis of guilt by association. After hearings outside the presence of the jury,[1] the district court found both officers to have specialized knowledge regarding gang identification as required by Rule 702 and allowed them to testify. *See id.*

The State urges that appellant waived any error because he failed to object to the admissibility of the same testimony through other witnesses and because the trial court gave a curative instruction regarding a portion of the testimony. Even if we assume that appellant failed to object to the same or similar testimony through lay witnesses, we cannot conclude that he has waived the issue. Texas courts have long recognized that experts can have a potentially prejudicial influence on juries. Whether or not designated as an expert in the presence of the jury, a witness appearing to testify on matters of expertise often appears inherently more credible to the jury than

---

[1] *See* Tex. R. Evid. 104(a).

5

does a lay witness. Consequently, a jury may more readily accept the opinion of a qualified witness testifying on matters of expertise. *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 553 (Tex. 1995). We conclude that appellant did not waive error. We will consider the curative instruction in a separate issue.

The qualification of an expert witness is within the trial court's discretion. *Broders v. Heise*, 924 S.W.2d 148, 151 (Tex. 1996). Rule 702 permits a witness qualified by knowledge, skill, experience, training, or education to testify on scientific, technical, or other specialized subjects if the testimony would assist the trier of fact in understanding or determining a fact issue. Tex. R. Evid. 702. An expert's opinion must be more than "subjective belief or unsupported speculation," but need not reach the level of "known to a certainty" to be admissible. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 590 (1993); *Nenno v. State*, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998). The inquiry is a flexible one. *Daubert*, 509 U.S. at 593. Rule 702 contains two initial hurdles that must be overcome before expert testimony will be admissible: the proponent of the testimony must establish that the expert's specialized knowledge will aid the trier of fact, and that the expert is qualified to testify on the subject. *See* Tex. R. Evid. 702.

Under the first prong, an expert's opinion should be based on specialized knowledge that is relevant to the facts in issue, and sufficiently reliable for the expert's testimony to assist the trier of fact. *Roise v. State*, 7 S.W.3d 225, 234 (Tex. App.—Austin 1999, pet. ref'd). As to a witness's qualifications, no rigid formula exists for determining whether a particular witness is qualified to testify as an expert. 2 Steven Goode et al., *Texas Practice: Guide to the Texas Rules of Evidence: Civil and Criminal* § 702.3 (Supp. 2000). The expertise must be measured against the

6

particular opinion the expert is offering. *Roise*, 7 S.W.3d at 234. While the proponent of the testimony has the burden of establishing the expert's qualifications, the trial court has the responsibility to ensure that "those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion." *Broders*, 924 S.W.2d at 152.

Courts have upheld the use of expert testimony to explain the operation, structure, membership, and terminology of gangs if it is relevant to the issues in the case. *See*, *e.g.*, *King v. State*, 29 S.W.3d 556, 560 (Tex. Crim. App. 2000); *Mason v. State*, 905 S.W.2d 570, 576-77 (Tex. Crim. App. 1995). Similarly, testimony based on knowledge acquired through interviews, case studies, review of literature in the field of study, and statistical research has been permitted. *See*, *e.g.*, *Russeau v. State*, 171 S.W.3d 871, 884 (Tex. Crim. App. 2005).

Chapter 71 of the Texas Penal Code governs the offense of engaging in organized criminal activity. Tex. Pen. Code Ann. §§ 71.01-.05 (West 2003 & Supp. 2005). Under Section 71.02, a person commits an offense if, "with the intent to establish, maintain, or participate in a combination or in the profits of a combination or as a member of a criminal street gang, he commits or conspires to commit" one or more of several enumerated crimes, including murder. *Id.* § 71.02(a) (West Supp. 2005). The term "combination" is defined as "three or more persons who collaborate in carrying on criminal activities." *Id.* § 71.01(a) (West 2003). A criminal street gang is "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities." *Id.* § 71.01(d). Because gang affiliation is an element of the offense, appellant does not challenge the relevance of the testimony; rather, he challenges the experts' qualifications and training on the subject.

7

The State first offered the testimony of Sergeant Seamans as an expert on gangs. In a hearing outside the presence of the jury, she testified to her qualifications. She has been employed with the Live Oak Police Department for over 21 years, first as a patrol officer and then as a patrol sergeant. For eleven years, she has been assigned to the criminal investigations division. In addition to standard training and various types of continuing education, her studies included gang-related information at the homicide investigation school and a handwriting school. She has a master's degree in human sciences, with emphases in sociology and education. She is studying for a doctorate in leadership studies. She has investigated numerous gang-related cases, has studied gangs from law-related and public sources, and has interviewed gang members. She is a member of the adjunct faculty at the University of Texas at San Antonio, teaching a course in concepts of criminal investigations that includes cults and gangs. She has also taught courses at law enforcement academies.

Seamans gave her opinions regarding the meaning of various gang signs, tattoos, symbols, and clothing. She testified about the activities of the Mexican Mafia as well as the organization's constitution and bylaws. She identified photographs recovered in the nearby town of Live Oak on April 19, 2002, and information received from a confidential informant in July 2002, both connecting appellant to membership in the Mexican Mafia and its organization. Deputy Sanchez had also received specialized training in gang identification and investigation, specifically including the Mexican Mafia. He also had conducted numerous investigations involving gangs, debriefing informants regarding the Mexican Mafia. Both Seamans and Sanchez testified that, in

addition to their course work and investigations, their knowledge was gained by discussions with gang officers, interviews of informants and gang members, and monitoring of websites.

The trial court held comprehensive hearings outside the presence of the jury and approached the issue with caution. The court heard the evidence of their qualifications and the evidence to be adduced, and concluded that the officers' experience and knowledge rose to the level of experts in their fields.

Following the hearing on Seamans, the court found that she was an expert with "knowledge that an ordinary lay person on the jury would not have" and that her expertise and experience allowed her to testify as an expert.[2] He limited Sanchez's testimony to the local gang and narcotics scene.

The trial court found that the State met its burden of demonstrating the qualifications of the experts and admitted the evidence in question. Based on the record before us, we cannot say that the trial court abused its discretion in admitting the expert testimony. *See Broders*, 924 S.W.2d at 151. We overrule appellant's fourth and fifth issues.

---

[2] That the court considered the question carefully is clear from its admonishment to the prosecutor during the hearing on Seamans:

> Now, I want to ask the State, though, just real candidly, why are you going through all of this and flying this close to the flames? What do you need it for? It is likely to prejudice a jury and/or could be. You're painting him as a gang member when you don't need to. You've got evidence. He's driving the getaway car. He's got blood on the back of his pants. You've got murder as a party wrapped up here. I don't know why you're going to this gang deal. It doesn't enhance the punishment any.

*Authentication of Photographic Evidence*

In his third issue, appellant contends that the trial court erred in admitting photographs and documentary evidence found in the search of an alleged member of the Mexican Mafia because they were not properly authenticated. The photographs and other evidence had been seized by Seamans in a search of the home of a suspected Mexican Mafia gang leader on April 19, 2002, the week before appellant's arrest. The exhibits were seized pursuant to a search warrant relating to money laundering at the home of a fellow gang member, Carlos Rios. The photographs contained pictures of several men, including appellant. Seamans testified that the photographs depicted individuals wearing gang-related clothing and "throwing" gang signs typical of the Mexican Mafia. Appellant objected to the admission of the seized items during Seamans's testimony because Seamans could not testify when or where the photographs were taken or the circumstances under which they were made.

Because appellant's wife and another defense witness identified appellant as well as other individuals in the photographs, the State urges that appellant waived this issue. The fact that defense witnesses were able to identify participants in the photographs does not necessarily resolve the authentication issue. We conclude that appellant preserved error with respect to this issue.

A trial court's decision as to whether evidence is properly authenticated is reviewed under the same abuse of discretion standard as the admissibility of evidence. *See Angleton v. State*, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998); *Smith v. State*, 683 S.W.2d 393, 404 (Tex. Crim. App. 1984) ("sufficiency of a predicate is addressed to the discretion of the trial court and will not be reversed absent an abuse of discretion"). The authentication requirement for admissibility does not

10

require the predicate from someone with personal knowledge of where or when the photograph was made; rather it "is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Tex. R. Evid. 901(a). Rule 901(b) provides a nonexclusive list of methods for authenticating evidence that includes testimony of a witness with knowledge that a matter is what "it is claimed to be," and distinctive characteristics of the evidence, including "appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Tex. R. Evid. 901(b)(1), (4).

A photograph may generally be authenticated by testimony that it is a fair and accurate representation of the actual scene or event. *Davidson v. Great Nat'l Life Ins. Co.*, 737 S.W.2d 312, 314-15 (Tex. 1987). It is not necessary that the photographer or any person who saw the making of the photograph testify. *Huffman v. State*, 746 S.W.2d 212, 223 (Tex. Crim. App. 1988); *Farrell v. State*, 837 S.W.2d 395, 400 (Tex. App.—Dallas 1992), *aff'd*, 864 S.W.2d 501 (Tex. Crim. App. 1993). Testimony that the photograph is what it purports to be is sufficient to authenticate the photographs; the accuracy of the testimony is a question for the jury. *Davidson*, 737 S.W.2d at 315; *Briones v. Levine's Dep't Store, Inc.*, 435 S.W.2d 876, 880 (Tex. Civ. App.—Austin 1968), *aff'd*, 446 S.W.2d 7 (Tex. 1969). If a verbal description of the material portrayed is admissible, then a photograph reflecting the verbal testimony is admissible. *Wilkerson v. State*, 726 S.W.2d 542, 547 (Tex. Crim. App. 1986).

At trial, appellant objected only that Seamans was not involved in the making of the photographs and did not know the circumstances under which they were made. He did not complain that the photographs had been tampered with. He did not dispute that appellant appeared in the

11

photographs; rather he argued that the photographs were as consistent with the men being on vacation in Mexico as with a photograph documenting a gang event. Seamans testified to the seizure of the documents and further identified individuals and indicia of gang activity; Sanchez and two defense witnesses identified individuals, including appellant, in the photographs.

The circumstances under which the evidence was obtained support a finding that they are authentic. They were found at the home of a gang member linked to appellant during a search conducted by the police pursuant to a warrant a week before the murder. The State presented evidence to show the circumstances under which the exhibits were obtained, that they had not been tampered with, and that they were connected to appellant. In addition, four witnesses identified appellant in the photograph as well as other individuals and circumstances in the photographs.[3] We conclude that the trial court did not abuse its discretion in admitting the documents. We overrule appellant's third issue.

### *Admission of Hearsay*

Appellant's first two issues relate to the experts' testimony that informants had advised them that appellant was a member of the Mexican Mafia. In his first issue, appellant challenges the introduction of testimony by Seamans and Sanchez that individuals in the photographs in which appellant appeared were members or prospective members of a gang, and that Seamans and

---

[3] Appellant also objects on the same authentication ground to the admission of a Mexican Mafia "constitution" found with the photographs. At trial, appellant objected only by reiterating "all our previously stated objections outside the presence of the jury." But these objections were to the photographs, and not to the document; he has waived this error. For an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for the objection. *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). A general objection normally presents nothing for review on appeal. *Williams v. State*, 596 S.W.2d 862, 866 (Tex. Crim. App. 1980).

12

Sanchez had been advised by confidential informants that appellant was a member of the Mexican Mafia. Appellant asserts that the court improperly admitted these statements over appellant's objections and erred in failing to grant a mistrial. Although the court gave a limiting instruction at the close of trial, appellant claims his rights to confrontation and cross-examination were violated. The State urges in the first instance that this error, if any, was waived by failure to object to the same testimony given by another witness. In a reply brief, appellant responds to the State's assertion of waiver that any unobjected-to testimony occurred *after* testimony to which he objected.

In his second issue, he urges that the trial court erred by failing to require the State to disclose the identity of the confidential informants whose statements to Seamans and Sanchez were introduced through their testimony. The State urges that this issue was waived or, in the alternative, became moot with the disclosure of Suarez's role as a confidential informant and that there was no further showing that disclosure was necessary as to any other person.

In her testimony, Seamans testified that a confidential informant had identified various individuals in the photographs as members of the Mexican Mafia. She also testified that a confidential informant had told her that appellant was a member of the Mexican Mafia. Likewise, Sanchez also testified that confidential informants had advised him that appellant was a member of the Mexican Mafia. Although appellant's objections were overruled at the time of testimony, the court included an *Instruction to Disregard* in its charge to the jury:

> With respect to testimony of Sgt. Anita Seamans and Deputy Enrique Sanchez, you are instructed to disregard for all purposes any of the testimony elicited from those witnesses attributable to unnamed confidential informants who have not been available to the defendant, John Anthony Hernandez, for cross examination. You absolutely shall not consider for any purpose testimony attributed to any unnamed

13

confidential informants by Sgt. Anita Seamans and Deputy Enrique Sanchez for any purpose as if it had never been presented before this jury.

The State contends that any error was waived by appellant's failure to object to the same testimony during the examination of Sergeant Tommy Ward, which occurred prior to the testimony of Seamans and Sanchez. The parties dispute the chronology of events as it relates to the admission of testimony regarding appellant's gang membership. The unobjected-to testimony of Ward was as follows:

Q. Did Santiago Suarez mention anything about himself and the Mexican Mafia?

A. Yes, he did.

Q. What did he say?

A. He said he was a prospective member in the Mexican Mafia.

Q. Did he mention anybody else about the Mexican Mafia?

A. Yes, he did.

Q. Who?

A. John Hernandez and Daniel Correa.

Q. And what were they?

A. They were members of the Mexican Mafia.

Appellant argues that this testimony occurred after the objectionable testimony of Seamans and Sanchez.

The trial chronology is relevant here. Appellant first raised the prospect of hearsay testimony during the cross-examination of Officer David Olson, who arrived at the scene of the vehicle stop at approximately 10:30 p.m. In his direct testimony, Olson testified that another officer had already stopped appellant's vehicle based on a traffic infraction. When Olson arrived, he activated the video camera unit on his car. On direct examination, the State introduced and played for the jury the videotape of the vehicle stop. Appellant did not object. On the tape, appellant gave permission to search the car. Olson testified to the items seized from appellant's vehicle, including a large quantity of money, and that he observed bloodstains on appellant's pants.

The officers then put Suarez in Olson's car. On cross-examination, defense counsel asked Olson about transporting Suarez to the county jail. He asked, "Did Santiago Suarez ever tell you during the transport, Officer Olson, that he alone committed the stabbing of Pablo Esquivel?" Over the State's hearsay objection, the court permitted the entire tape to be played. When it became clear that the videotape did not contain the transport portion, the court directed the State to produce any exculpatory tapes containing the voices of Suarez or Correa that had not already been produced.

When the defense sought to introduce into evidence Suarez's videotaped interviews, the State again objected to the introduction of hearsay statements. The court overruled the State's objections and allowed the introduction of Suarez's videotaped interviews occurring on two different days. On cross-examination of Comal County Deputy Sheriff Doug Phillips, defense counsel elicited Suarez's statements to Phillips in the jail.

After Phillips testified, Detective Sergeant Tommy Ward began his testimony. Ward testified that he arrived at the crime scene shortly after 10:10 p.m. He directed a team of detectives

at the scene and at the traffic stop of appellant's vehicle. He was advised by Deputy Phillips that appellant's pants had "a blood swipe in the shape of a knife blade across the shorts." He testified to the various items of evidence seized pursuant to the search warrant. On cross-examination, defense counsel queried Ward on his failure to request various items of evidence to be sent to the Department of Public Safety laboratory for analysis. Defense counsel then turned to Ward's interview of Suarez to elicit Suarez's admission that he owned the knife used to stab Esquivel. Upon a hearsay objection by the State, the court dismissed the jury for argument by counsel. Defense counsel urged,

> Judge, what we've learned is that on the Suarez tape, one of the two interviews by Sergeant Detective Ward, the suspect Suarez told the FBI agent who was present with Detective Sergeant Ward that he was the owner of the stainless steel folding knife and that he, Suarez, had the receipt for the knife on his television at home.

The court reserved its decision "to sort this out," with further argument and briefing from counsel.

In the meanwhile, the trial continued with the hearing out of the presence of the jury on the issue of whether Seamans would be allowed to testify as an expert on gangs. After the hearing, the court determined that Seamans would be allowed to testify. Her testimony, however, did not commence until after Ward was recalled and testified to the unobjected-to testimony set forth above. After Ward testified for a short time, he was excused subject to recall for additional testimony about the Suarez interviews.

Seamans and Sanchez then testified, making references to receiving information that appellant was a gang member, a "caradinale." They also identified appellant and other gang members in the photographs. The State then recalled Ward to the stand to continue with his direct

16

examination. On that date, appellant filed a motion to require the state to disclose any confidential informants. On cross-examination, defense counsel focused on the Suarez videotaped interviews. After extensive questioning regarding Ward's interviews and "handling" of Suarez, defense counsel introduced into evidence the lengthy videotaped interviews of Suarez. The court admitted Suarez's videotaped interviews over the State's hearsay objection.

In the interviews, Suarez at first denied his involvement in the crime and then, in a second interview, admitted that he was the one who actually stabbed the deceased. In the interview, Suarez also stated that he was a prospective member—a "prospecto"—of the Mexican Mafia, and that appellant and Correa were members of the gang, and that appellant was a "caradinale." Suarez explained that the three men were looking for Esquivel's nephew, Juan Salinas or Big John, who had lived with Esquivel and who owed money to the gang. On the evening in question, appellant was "collecting the dime," a 10 percent payment of a drug dealer's take paid to the gang for dealing drugs in a particular area. Suarez committed the stabbing as a prospective member—to show that he was not weak.

We agree with the State that appellant failed to preserve error. Here, the court overruled an objection to evidence after the same evidence had already been admitted without objection. Overruling an objection to evidence will not result in reversal when other such evidence was received without objection, "either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998). That appellant waived error became clear when he offered into evidence the Suarez tapes also containing the complained-of testimony. Whether

17

viewed as waiver, as we do in this instance, or as harmless error, *see Jones v. State*, 843 S.W.2d 487, 493 (Tex. Crim. App. 1992), appellant's first issue is without merit.

Because appellant filed a motion seeking the identity of any confidential informants "who have been providing uncorroborated hearsay statements as to Mexican Mafia membership and activities by the Defendant," he did not waive the second issue. On the date the written motion was filed, without deciding the motion and after a conference in chambers, the trial court took it under advisement "without denying or granting it at this time." The court reasoned that its *Instruction to Disregard* cured any reference to an unnamed confidential informant. Appellant declined to offer an alternative instruction, urging instead that the instruction would be insufficient to cure the error or prevent prejudice to appellant. Because the State disclosed the identity of Suarez as a confidential informant and appellant did not establish the predicate for disclosure of any other confidential informant, the State urges that the issue became moot.

Until Suarez's statements and interviews were introduced through Detective Ward's testimony and the videotaped interviews played for the jury, witnesses, including Seamans and Sanchez, had referred to him as a confidential informant. It is undisputed that Suarez was the only informant who was present at the crime scene. At trial, the State urged that it was not required to identify other informants because appellant had failed to establish the predicate for such disclosure.[4]

---

[4] The State may withhold the identity of an informant unless he (1) participated in the offense; (2) was present at the time of the offense or arrest; or (3) was otherwise shown to be a material witness to the transaction or to whether appellant knowingly committed the act charged. *Stein v. State*, 548 S.W.2d 61, 63 (Tex. Crim. App. 1977); *Carmouche v. State*, 540 S.W.2d 701, 703 (Tex. Crim. App. 1976).

18

Because Suarez was fully disclosed and the instruction was clear and unambiguous, we may presume the jury followed the trial court's instructions in the manner presented. *See Thrift v. State*, 176 S.W.3d 221, 224 (Tex. Crim. App. 2005); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) (jury presumed to follow court's instructions as given); *Waldo v. State*, 746 S.W.2d 750, 753 (Tex. Crim. App. 1988) (jury presumed to follow instruction to disregard evidence); *Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App. 1987). In addition, appellant does not assert that he demonstrated the predicate necessary for the disclosure of any other informants. We overrule appellant's second issue.

In his eighth issue, appellant contends that the trial court erred in failing to strike the testimony of Amelia Esquivel relating to a statement made by Correa. Appellant complains that the trial court denied his motion to strike the testimony of Mrs. Esquivel in which she testified that, two weeks prior to the death of her husband, Correa came to their house looking for Juan Salinas and stating that Salinas owed him money. We conclude that appellant waived any error in the admission of Mrs. Esquivel's testimony by failing to seek a timely ruling on his objection, and further by eliciting the same or substantially similar testimony during the testimony of Detective Ward and through the introduction of the Suarez videotapes.

The record shows that, prior to Mrs. Esquivel's testimony, appellant objected to her testimony "as to anything at all that Daniel Correa would have said" as a violation of appellant's right to confront the witness. On direct examination, Mrs. Esquivel testified,

> Two weeks before they killed my husband, [Correa] had gone to my house. Me and my husband were sitting out on the picnic table. . . . And he asked for Juan Salinas.

19

> And we told him he no longer resided in our house no more. And he said that he was looking for him because Juan Salinas owed him some money. . . ."

Appellant did not object to this testimony. On cross-examination, defense counsel inquired further about the conversation, asking how much Correa said Salinas owed and whether he asked the Esquivels "personally" for the debt. Counsel sought to establish that Correa was "friendly" and not "aggressive" or "rude." On cross-examination of Detective Ward and with the introduction of the Suarez videotapes, appellant elicited the same or substantially similar testimony. The record demonstrates that appellant waived this issue. We overrule issue eight.

### *Witness's Invocation of Fifth Amendment Privilege*

In his sixth issue, appellant contends that the trial court erred in permitting defense witness Daniel Correa to invoke his Fifth Amendment right not to testify.

On the first day of appellant's trial, Correa pleaded guilty as part of a negotiated plea. Appellant subpoenaed Correa to testify at trial as a defense witness. Outside the presence of the jury, Correa was sworn in as a witness and then, on the advice of his counsel, he invoked his privilege against self-incrimination. Correa's guilty plea memorandum, which was marked but not admitted into evidence, showed that Correa had pleaded guilty to the lesser-included offense of murder, admitting that "I acting as a party with John Anthony Hernandez and Santiago Suarez Jr. did knowingly and intentionally murder Pablo Esquivel." As part of the plea agreement, the State waived the deadly weapon finding, Correa waived his rights to trial and to appeal, and punishment was assessed at eleven years' confinement.

20

Appellant asked the trial court to direct Correa to testify; the court declined. Ruling that he would honor Correa's invocation of his rights and not order him to testify, the court found it even more "compelling" to allow the invocation because Correa had pleaded guilty as a party and not as an actor.

In an offer of proof, defense counsel proffered the facts to which he believed Correa would testify if called as a witness: that appellant, Correa, and Suarez did not have a prior agreement to kill anyone; that they were not "collecting the dime" on the evening in question; that Correa had not gone to the Esquivel residence looking for Juan Salinas; and that appellant and Correa had not anticipated that Suarez would stab Esquivel.

An individual's constitutional privilege against self-incrimination overrides a defendant's constitutional right to compulsory process of witnesses. *Ellis v. State*, 683 S.W.2d 379, 383 (Tex. Crim. App. 1984); *Grayson v. State*, 684 S.W.2d 691, 696 n.2 (Tex. Crim. App. 1984). The trial court is necessarily accorded broad discretion in determining the merits of a claimed privilege. *United States v. Lyons*, 703 F.2d 815, 818 (5th Cir. 1973). A witness who claims the Fifth Amendment privilege is not the exclusive judge of the right to exercise the privilege; rather, the trial court is entitled to determine whether the refusal to answer appears to be based upon the good faith of the witness and is justifiable under the circumstances. *Farmer v. State*, 491 S.W.2d 133, 135 (Tex. Crim. App. 1973). Before a trial court may compel a witness claiming the privilege to answer, it must be clear, from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer cannot possibly have a tendency to incriminate. *Hoffman v. United States*, 341 U.S. 479, 488 (1951); *Grayson*, 684 S.W.2d at 696.

21

This Court has previously addressed this question in *Chandler v. State*. 744 S.W.2d 341, 342 (Tex. App.—Austin 1988, no pet.); *see also Suarez v. State*, 31 S.W.3d 323, 329 (Tex. App.—San Antonio 2000, no pet.); *Delrio v. State*, 866 S.W.2d 304, 306 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd) (even when a codefendant has pleaded guilty and has been sentenced in connection with the offense, he may still properly invoke his privilege against self-incrimination because if his testimony contradicts any previous judicial admissions, he could subject himself to a charge of perjury). In *Chandler*, we declined to find the trial court erred in refusing to compel the witness's testimony. 744 S.W.2d at 343; *Delrio*, 866 S.W.2d at 306.

Based on the record before us, we cannot say the trial court erred in refusing to require Correa to testify. We overrule appellant's sixth issue.

### Substitution of Visiting Judge

In his seventh issue, appellant complains that the trial court abused its discretion in appointing a substitute judge for two days of the ongoing trial while the judge attended a seminar. Appellant objected to the substitution and argued that because of the voluminous testimony, "neither judge was in a position to formulate the jury charge, without causing irreparable harm and prejudice to appellant." He urges that the substitution violated his right to due process of law as guaranteed by both the United States and Texas constitutions. *See* U.S. Const. amend. XIV, § 1; Tex. Const. art. I, § 19.

The record reflects that the Honorable Jack Robison, District Judge of the 22nd Judicial District, presided in this cause during the guilt-innocence phase of the two-week trial. On the afternoon of the seventh day of trial, the Honorable Mike McCormick, former presiding judge

of the Texas Court of Criminal Appeals, substituted and presided over the proceedings on the eighth day of trial and for an abbreviated session on the ninth day. Judge Robison returned for the last day of the guilt-innocence phase and the punishment stage of the proceedings. Punishment was set by the jury.

Although appellant asserts that the substitution caused him irreparable harm and prejudice, he does not demonstrate how he was harmed. Absent an abuse of discretion, the substitution of judges during trial does not constitute reversible error. *See Browning v. State*, 488 S.W.2d 804, 805 (Tex. Crim. App. 1972); *Floyd v. State*, 488 S.W.2d 830, 832 (Tex. Crim. App. 1972); *Randel v. State*, 219 S.W.2d 689, 698 (Tex. Crim. App. 1949). No abuse of discretion having been shown, we find appellant's contention to be without merit. We overrule appellant's seventh issue.

***Charge Error***

In his ninth issue, appellant contends that the trial court erred in submitting an erroneous application paragraph requiring the jury to find the defensive theories in the conjunctive rather than disjunctively. Because appellant did not object to the application paragraph, he agrees that reversal is not required unless any error was so egregious and created such harm that appellant was denied a fair trial. *See Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985).

The complained-of language concerns appellant's defensive theories. He raised three distinct theories during trial: (i) that appellant was factually mistaken regarding the reason for seeking out Salinas and did not know that the purpose of finding him would be to extort money but

23

believed that they were only going to talk to him; (ii) that the stabbing was in self-defense and necessary to protect himself against the use or attempted use of unlawful deadly force by Esquivel; and (iii) that Suarez had acted out of an independent impulse in stabbing Esquivel and appellant had no reason to anticipate the act.

In the application paragraph on engaging in organized criminal activity, the court first included the elements of the offense for which the jury could find appellant guilty

> "provided that you further find beyond a reasonable doubt that: (1) the defendant did not have a mistake of fact, as applied in Paragraph XII of this charge; (2) the defendant, Santiago Suarez, Jr. did not act in self-defense, as applied in Paragraph XIII of this charge, and (3) Santiago Suarez, Jr. did not act upon an independent impulse, as applied in Paragraph XIV."

Reasonable belief "thereof" would result in acquittal. The paragraph continued with an instruction on the lesser-included offense of murder.

The three defensive theories were then set out and explained in separate paragraphs, each with an instruction that if the jury found beyond a reasonable doubt that appellant did not prove that defense, "as that term has been defined herein, you shall find against the defendant on this issue." The jury was thus directed to examine each of the applicable application paragraphs independently and determine whether appellant should be acquitted based on the language found in *any* of the three paragraphs. The jurors were not instructed to find all three theories valid before they could acquit. We conclude that the trial court did not err in its charge to the jury and that any error did not rise to the level of egregious harm. We overrule appellant's ninth issue.

24

## CONCLUSION

Because appellant has not shown any reversible error, we overrule his issues and affirm the judgment of conviction.

_____

Jan P. Patterson, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   January 26, 2006

Do Not Publish